WC:MAG
F.#2010R01329

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

# M-10-792

- - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

MARCELLA ERAIFEJ, CHRISTINA MARJI
and RAID RABADI,

        Defendants.

**TO BE FILED UNDER SEAL**

COMPLAINT AND AFFIDAVIT IN
SUPPORT OF APPLICATION FOR
ARREST WARRANTS
(T. 18, U.S.C., § 1349)

- - - - - - - - - - - - - - - - - X

EASTERN DISTRICT OF NEW YORK, SS:

        Candice Stephenson, being duly sworn, deposes and says
that she is a Special Agent with the United States Department of
Health and Human Services, Office of the Inspector General
("HHS-OIG"), duly appointed according to law and acting as such.

        Upon information and belief, there is probable cause to
believe that in or about and between December 2007 and March
2010, both dates being approximate and inclusive, within the
Eastern District of New York and elsewhere, the defendants
MARCELLA ERAIFEJ, CHRISTINA MARJI and RAID RABADI, together with
others, did knowingly and willfully conspire to execute a scheme
and artifice to defraud Medicare and Medicaid and to obtain, by
means of materially false and fraudulent pretenses,
representations and promises, money and property owned by, and
under the custody and control of, Medicare and Medicaid, in
connection with the delivery of and payment for health care

2

benefits, items and services, all in violation of Title 18, United States Code, Section 1347.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

The source of your deponent's information and the grounds for her belief are as follows:

1. I have been a Special Agent with the Department of Health and Human Services-Office of Inspector General for approximately eight years. The information contained in this affidavit is based upon my review of the evidence related to this investigation.

2. Because the purpose of this affidavit is to set forth only those facts necessary to establish probable cause to arrest, I have not described all of the relevant facts and circumstances of which I am aware. Additionally, except as otherwise noted, I have not differentiated between information about which I have personal knowledge, and information received from other law enforcement sources.

3. Throughout this affidavit, my beliefs are expressly stated, and all conversations are recounted in sum and substance.

**BACKGROUND**

The Medicare Program

4. The Medicare Program ("Medicare") is a federal health care program providing benefits to persons who are over the age of 65 or disabled. Medicare is administered by the Centers for Medicare and Medicaid Services, a federal agency under the United States Department of Health and Human Services. Individuals who receive Medicare benefits are called, "Medicare beneficiaries."

5. Medicare is a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

6. Medicare includes coverage under two primary components, hospital insurance ("Part A") and medical insurance ("Part B"). Medicare Part B covers the costs of physicians' services and outpatient care, including an individual's access to durable medical equipment ("DME").

7. DME includes, among other items, oxygen concentrators, hospital beds, power wheelchairs, diabetic supplies and ankle braces. Medicare covers the reasonable cost of DME, provided that it is: (1) eligible for a defined Medicare benefit category; (2) reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body part; and (3) meets all other Medicare statutory and regulatory requirements and criteria:

4

a. For heat-molded diabetic shoe inserts, the beneficiary must suffer from diabetes mellitus and a severe foot condition. In addition, a treating physician who is managing the beneficiary's condition must certify that the physician is treating the beneficiary under a comprehensive plan of care for his/her diabetes and that the beneficiary needs the diabetic shoe inserts;

b. For ankle gauntlets, the beneficiary must be ambulatory with weakness or deformity of the foot and ankle, require stabilization for medical reasons, and have the potential to benefit functionally weakness or deformity of the foot and ankle. A treating physician must provide a written signed and dated order prior to the DME supplier billing for the item;

c. For semi-electric hospital beds, the beneficiary must require frequent changes in body position and must either: (1) have a medical condition that requires positioning not feasible in an ordinary bed; (2) require positioning not available from an ordinary bed to alleviate pain; (3) require his or her head to be lifted more than 30 degrees most of the time due to a medical condition; or (4) require traction equipment which can only be attached to hospital bed. The DME supplier must receive a written, signed and dated physician order before billing for the item; and

d. For oxygen concentrators, a treating physician must determine that the beneficiary suffers from a lung disease or another condition that may improve with oxygen therapy, the patient's arterial blood gas falls within a specific range, and alternative means were tried and failed or were not helpful to the patient the beneficiary must suffer Medicare covers the rental of oxygen equipment. The DME supplier must receive a written, signed and dated physician order or certificate of medical necessity from the treating physician.

8. Medicare pays approximately $140 per month for rental of oxygen concentrators, $76 per month for rental of hospital beds, $130 for heat-molded shoe inserts and $141 for ankle gauntlets.

9. Medicare does not reimburse for claims submitted in violation of Medicare statutes and regulations.

10. DME suppliers must submit a Medicare Enrollment Application ("application") to Medicare to participate in Medicare and bill for DME claims. To receive reimbursement for a covered service from Medicare, a medical provider is required to submit a claim, either electronically or in writing through Form CMS-1500 or UB-92. The claim includes information identifying the patient, the items or services provided, date of service and referring physician.

6

The Medicaid Program

11.    The New York Medicaid Program ("Medicaid") is a
health care program for New Yorkers who cannot afford to pay for
medical care and meet certain financial and other requirements.
The New York State Department of Health administers New York
Medicaid.    Individuals who receive Medicaid benefits are called
"Medicaid beneficiaries."

12.    Medicaid is a "health care benefit program" as
defined by Title 18, United States Code, Section 24(b).

13.    Medicaid covers the costs of physicians' services
and outpatient care, among other items and services, including an
individual's access to DME.    Medicaid only covers the costs of
DME if the DME is medically necessary as prescribed by a health
care provider and meets other criteria.    Medicaid requires that
claims for DME be supported by an original, written order of a
licensed physician, dentist, podiatrist, physician assistant or
nurse practitioner.

14.    To receive reimbursement for a DME from Medicaid,
a DME provider is required to submit a claim.    The claim includes
information identifying the medical provider, the patient, the
items provided and the referring physician.

The Defendants

15.   Defendant MARCELLA ERAIFEJ resides in Yonkers, New York, within the Southern District of New York.

16.   Defendant CHRISTINA MARJI resides in Brooklyn, New York, within the Eastern District of New York.

17.   Defendant RAID RABADI is the owner and Chairman of O2 Home Services, Inc., a New York corporation.  He does business at his home in Massapequa, New York, within the Eastern District of New York.

### THE FRAUDULENT SCHEME

18.   In or about and between December 2007 and March 2010, both dates being approximate and inclusive, defendants MARCELLA ERAIFEJ, CHRISTINA MARJI and RAID RABADI, together with others, conspired to execute and executed a scheme to defraud Medicare and Medicaid by: (a) causing the submission of claims to Medicare and Medicaid for DME that was not medically necessary or was never provided to the beneficiaries, and (b) soliciting, paying and concealing illegal kickbacks.

19.   On March 24, 2010, law enforcement agents arrested the owner and President of Jayson Drugs, Inc., a pharmacy and DME supplier located in Franklin Square, New York, on charges of health care fraud, in violation of Title 18, United States Code, Section 1347.  In conjunction with the arrest, law enforcement

8

agents conducted a search of Jayson Drugs and interviewed employees.

20.   Jayson Drugs employees told agents that a man named RAID RABADI had been doing business directly with the owner of Jayson Drugs for over one year.   RAID RABADI did not work in the store and was not an employee.   They reported that since RAID RABADI starting doing business with the owner of Jayson Drugs, there was an increase in DME and rentals, particularly from beneficiaries who lived in Yonkers and the Bronx.

21.   The employees told agents that they received calls from beneficiaries from Yonkers complaining that they received DME from Jayson Drugs that they did not need, did not want and did not expect.   Beneficiaries also complained that they did not understand why a pharmacy located in Franklin Square would be sending them DME in Yonkers.   They requested that store personnel retrieve the unwanted DME.   One employee noted that several complaints involved DME prescribed by physicians with the last name "Sayegh." He reported that Jayson Drugs started receiving prescriptions from those physicians after RAID RABADI started working with the owner of Jayson Drugs.

22.   Documents retrieved at the search demonstrate that RAID RABADI and the owner of Jayson Drugs planned to split the profits from the DME billing and were calculating how much money

they could make.  Fax documents addressed to RAID RABADI from the owner of Jayson Drugs include the following statements:

a.    "DIABETIC SHOES

1 pair shoes A5500 -> 63.58-> 50.86
3 pair inserts A5512 -> 155.64 -> 124.51
1 foot gauntlet L1902 -> 84.24 -> 67.39
                                      242.76
108.76 profit per year!"

b.    "Bed -> 1269 - 480 = 784 profit over 13 months!" and

c.    "Bed $1179-532=647÷2=323 for Bed
POV $3190 -935=2263÷2=1131 for scooter
W/C $433-189=244÷2=122 for chair."

23.  The search also uncovered documents in which the owner of Jayson Drugs asked RAID RABADI for prescriptions for DME or received fax prescriptions.  For example, one fax from the owner of Jayson Drugs to RAID RABADI states, "FAX RX (1) Bed 12/16/08 (2) Shoes 12/16/08."

24.  Telephone billing records indicate that RAID RABADI and the owner of Jayson Drugs started calling each other on December 6, 2007.  Since that time, they called each other several times a week.

25.  Medicare billing data shows a stark increase in Jayson Drugs' billing for Yonkers beneficiaries since the time that RAID RABADI started communicating with the owner of Jayson Drugs.  Between January 2007 to November 2007, Jayson Drugs' Medicare billing for DME for Yonkers beneficiaries was $1,623.06.  However, Medicare billing for December 2007, the time when RAID

RABADI and the owner of Jayson Drugs started communicating with each other, was $48,866.96. In 2008, Jayson Drugs Medicare billing for Yonkers DME was $486,217.95. In 2009, the Medicare billing was $1,691,126.05.

26. Bank records reveal that RAID RABADI received multiple checks from Jayson Drugs through his company O2 Home Services. The owner of Jayson Drugs signed all the checks. On certain checks, the word "fee" is written in the memo field. In 2009 alone, RAID RABADI received checks in the amount of $545,753.33 from Jayson Drugs. The owner of Jayson Drugs paid RAID RABADI out of the same bank account in which Jayson Drugs' Medicare and Medicaid payments were deposited.

27. Bank records show that Family Member #1, Family Member #2 and Family Member #3 also received checks from Jayson Drugs signed by the owner of Jayson Drugs. Those checks also came from the Jayson Drugs bank account in which Medicare and Medicaid payments were deposited. On several checks, the word "fee" or "O2" is written in the memo field. The checks to Family Member #1 and Family Member #2 were deposited into a joint bank account they opened at Capital One Bank on March 10, 2009. The checks to Family Member #3 were primarily deposited into his bank account at JPMorgan Chase Bank. Two checks that the owner of Jayson Drugs wrote to Family Member #3 were deposited into O2 Home Services' bank account.

28.  Family Member #1, Family Member #2 and Family Member #3 are not employees of Jayson Drugs.  Family Member #1 listed her employer as "Waldbaums" on her Capital One bank account.  Family Member #2 listed her occupation as "student." Law enforcement agents approached Family Member #2 on March 24, 2010, regarding her relationship with Jayson Drugs.  She told them that she never worked for Jayson Drugs.  She said she had assisted RAID RABADI at home with some faxing to Jayson Drugs.

29.  Domestic financial institutions are required by law and regulation to file a Currency Transaction Report (IRS Form 4789, hereafter referred to as a "CTR") with the IRS for each transaction in currency, such as a deposit, withdrawal, exchange of currency or other payment or transfer by, through or to a financial institution, in excess of $10,000, as required by Title 31, United States Code, Section 5313 and Title 31, Code of Federal Regulations, Section 103.22(a).  CTRs are filed with the IRS on forms which require, among other things, the identity of the individual who conducted the transaction and the individual or organization for whom the transaction was completed.  CTRs are required to be filed to assist the government in criminal, tax and regulatory investigations and proceedings, as stated in Title 31, Code of Federal Regulations, Section 103.21.

30.  "Structuring" financial transactions means intentionally breaking down an amount of currency in excess of

12

$10,000 into amounts of $10,000 or less and then separately transacting these smaller amounts with one or more domestic financial institutions in an attempt to evade the currency transaction reporting requirements. See 31 U.S.C. § 5324(c). Structuring is the method most frequently used by money launderers to launder their illegal proceeds.

31.   Based on my training and experience investigating financial transactions surrounding health care fraud, I know that individuals that structure transactions with the intent to evade reporting requirements commonly: (1) engage in transactions between $6,000 to $9,900; and (2) engage in multiple transactions between $6,000 and $9,000 in a single day or over a period of several days.   The following spreadsheet is a summary of the checks deposited to RAID RABADI's O2 Home Services, Family Member #1, Family Member #2 and Family Member #3's bank accounts that indicate a pattern of structuring.

| DATE | Check Number | PAYOR | PAYEE | AMOUNT |
|------|--------------|-------|-------|--------|
| 2/26/09 | 5073 | Jayson Drugs | Family Member #1 | $7,700 |
| 2/26/09 | 5072 | Jayson Drugs | Family Member #1 | $7,700 |
| 3/10/09 | 5088 | Jayson Drugs | Family Member #1 | $9,000 |
| 3/10/09 | 5085 | Jayson Drugs | Family Member #2 | $9,000 |
| 3/10/09 | 5086 | Jayson Drugs | Family Member #1 | $9,000 |
| 3/30/09 | 5135 | Jayson Drugs | Family Member #3 | $7,500 |
| 3/30/09 | 5136 | Jayson Drugs | Family Member #3 | $7,500 |

| 5/4/09 | 5522 | Jayson Drugs | Family Member #1 | $8,100 |
| 5/4/09 | 5523 | Jayson Drugs | Family Member #1 | $8,100 |
| 5/4/09 | 5524 | Jayson Drugs | Family Member #2 | $8,100 |
| 6/3/09 | 5568 | Jayson Drugs | Family Member #1 | $9,000 |
| 6/3/09 | 5570 | Jayson Drugs | Family Member #2 | $9,370 |
| 6/10/09 | 5581 | Jayson Drugs | Family Member #2 | $9,630 |
| 6/10/09 | 5582 | Jayson Drugs | Family Member #1 | $7,150 |
| 6/22/09 | 5605 | Jayson Drugs | Family Member #3 | $5,000 |
| 6/23/09 | 5607 | Jayson Drugs | O2 Home Services | $5,000 |
| 7/10/09 | 5638 | Jayson Drugs | Family Member #1 | $9,300 |
| 7/10/09 | 5639 | Jayson Drugs | Family Member #2 | $9,700 |
| 7/9/09 | 5640 | Jayson Drugs | Family Member #2 | $9,500 |
| 10/1/09 | 6055 | Jayson Drugs | Family Member #1 | $6,000 |
| 10/1/09 | 6066 | Jayson Drugs | O2 Home Services | $8,500 |
| 3/16/10 | 1103 | Jayson Drugs | O2 Home Services | $8,400 |
| 3/15/10 | 1104 | Jayson Drugs | Family Member #3 | $9,000 |

32.    In total, Family Member #2 received checks in the amount of $79,900 from Jayson Drugs, Family Member #1 received $81,050 and Family Member #3 received $38,974.

33.    Family Member #1 and Family Member #2's cash withdrawals also show a pattern of structuring.  The following spreadsheet is a summary of cash withdrawals from their bank account:

| Date | Withdrawn by | Amount |
|------|--------------|--------|
| 5/19/09 | Family Member #1, Family Member #2 | $9,900 |
| 6/1/09 | Family Member #2 | $6,000 |

| 6/17/09 | Family Member #2 | $9,900 |
| 6/25/09 | Family Member #1 | $9,000 |
| 6/27/09 | Family Member #2 | $9,900 |
| 9/10/09 | Family Member #2 | $9,900 |
| 9/11/09 | Family Member #2 | $9,900 |
| 9/12/09 | Family Member #2 | $9,900 |
| 9/16/09 | Family Member #2 | $9,900 |
| 9/17/09 | Family Member #2 | $9,900 |
| 9/24/09 | Family Member #2 | $9,900 |
| 9/28/09 | Family Member #1 | $9,500 |
| 10/13/09 | Family Member #2 | $9,900 |
| 10/27/09 | Family Member #2 | $9,500 |

34.   I spoke to employees at Capital One Bank.   The
employees reported that RAID RABADI accompanied Family Member #2
to open the bank account on March 10, 2009.   RAID RABADI stated
that he did not want his name to appear on the bank account.
Tellers also stated that RAID RABADI would accompany Family
Member #1 and Family Member #2 to the bank when they conducted
financial transactions.

35.   Law enforcement agents conducted in-person
interviews of beneficiaries who lived in Yonkers and who,
according to Medicare and Medicaid billing data, received DME
from Jayson Drugs.   Agents selected the Yonkers beneficiaries
because they were brought to Jayson Drug as a result of RAID
RABADI's relationship with the owner of Jayson Drugs.   Those
beneficiaries reported that they either received DME that was not

15

medically necessary and not prescribed by their treating physician or that they never received the DME.

36. Beneficiaries A and B reported that they were recruited to obtain DME by the woman who greets the attendees at the Thursday afternoon food bank at Yonkers First Arabic Baptist Church. That church is located at 98 Waverly Street in Yonkers, New York. On July 1, 2010, law enforcement agents attended the food bank and identified the woman who greets the attendees as MARCELLA ERAIFEJ.

(A) Beneficiary A reported that she attends the food bank on Thursday afternoons. She stated that the woman who greets the people approached her and asked her if she would like some shoes. She responded in the affirmative. The woman did not ask Beneficiary A about her medical history or tell her to go her treating physician. Instead, the woman took Beneficiary A's personal information and filled out a form. Beneficiary noted that the woman had commented that she and Beneficiary A share the same birthdate, June 30th. MARCELLA ERAIFEJ's birthdate is June 30, 1960. Law enforcement agents showed Beneficiary A a photo spread of several women. Beneficiary A identified MARCELLA ERAIFEJ from the photo spread as the woman who offered her shoes.

Beneficiary A later received shoes in the mail from Jayson Drugs. Beneficiary A was shown the following list of DME for which Jayson Drugs submitted Medicare claims under her name:

| Beneficiary | DME Item | Date of Claim | Amount Billed |
|-------------|----------|---------------|---------------|
| A | Diabetic shoes | 11/12/08 | $361.90 |
| A | Portable Gas Oxygen System Rental | 11/12/08 | $59.99 |
| A | Heat-molded Diabetic shoe inserts | 11/12/08 | $239.70 |
| A | Ankle Gauntlet | 11/12/08 | $189.95 |
| A | Oxygen Concentrator | 11/12/08 | $209.99 |

Beneficiary A reported that she never ordered nor received the portable gas oxygen system, the ankle gauntlet or the oxygen concentrator.

(B) Beneficiary B reported that she was also approached by the woman who greets people at the food bank. She stated that the woman asked her if she would like shoes and that Medicaid would pay for it. The lady did not ask her about her medical history. Beneficiary B looked through a catalog and placed an order for diabetic shoes by providing her Medicaid number and personal information to the woman. She reported that she did not know the physician identified as the referring physician in the Jayson Drugs billing. Two men later delivered two pairs of diabetic shoes to her. She had only ordered one

pair. She did not receive any other items. However, Jayson
Drugs billed Medicaid for the following items:

| Beneficiary | DME Item | Date of Service | Amount Billed |
|---|---|---|---|
| B | Ortho ladies shoes | 9/15/09 | $120 |
| B | Foot inserts | 9/15/09 | $120 |
| B | AFO ankle gauntlets | 9/15/09 | $200 |
| B | Indomethacin | 9/15/09 | $298.95 |

37. Beneficiary C reported that she was approached by
a woman at Calgary Church of Garden Christ to order DME. The
woman showed her a catalog. Beneficiary C provided the woman
with her social security number and ordered a hospital bed and a
paid of diabetic shoes from the woman. She did not go to her
treating physician. Jayson Drugs delivered an oxygen tank, a
hospital bed and two pairs of diabetic shoes to her. She
contacted Jayson Drugs and returned the oxygen tank and a pair of
diabetic shoes. In connection with this beneficiary, Jayson Drugs
billed Medicare for:

| Beneficiary | DME Item | Date of Claim | Amount Billed |
|---|---|---|---|
| C | Hospital Bed | 11/25/08 | $189.95 |
| C | Oxygen Concentrator | 11/25/08 | $209.99 |
| C | Portable Gas Oxygen System | 11/25/08 | $59.99 |
| C | Diabetic shoes | 11/25/08 | $361.90 |
| C | Diabetic shoe inserts | 11/25/08 | $239.70 |

| C | Ankle gauntlets | 11/25/08 | $189.95 |
|---|---|---|---|
| C | Oxygen concentrator | 12/25/08 | $209.99 |
| C | Portable Gas Oxygen System | 12/25/08 | $59.99 |
| C | Hospital Bed | 12/25/08 | $189.95 |
| C | Oxygen Concentrator | 1/25/09 | $209.99 |
| C | Portable Gas Oxygen System | 1/25/09 | $59.99 |
| C | Hospital Bed | 1/25/09 | $189.95 |
| C | Hospital Bed | 2/25/09 | $189.95 |
| C | Oxygen Concentrator | 2/25/09 | $209.99 |
| C | Portable Gas Oxygen System | 2/25/09 | $59.99 |
| C | Hospital Bed | 3/27/09 | $189.95 |
| C | Oxygen Concentrator | 3/27/09 | $209.99 |
| C | Portable Gas Oxygen System | 3/27/09 | $59.99 |
| C | Hospital Bed | 4/29/09 | $189.95 |
| C | Hospital Bed | 5/29/09 | $189.95 |
| C | Hospital Bed | 6/29/09 | $189.95 |
| C | Hospital Bed | 7/29/09 | $189.95 |
| C | Hospital Bed | 8/29/09 | $189.95 |
| C | Hospital Bed | 9/29/09 | $189.95 |
| C | Hospital Bed | 10/29/09 | $189.95 |

38.   Beneficiary D reported that she never received the diabetic shoes, inserts or ankle braces that Jayson Drugs had claimed to have provided her.   In addition, she reported that her

physician was not the physician listed as the referring physician on the Medicare claim. Jayson Drugs' Medicare billing for this beneficiary included the following:

| Beneficiary | DME Item | Date of Claim | Amount Billed |
|---|---|---|---|
| D | Diabetic Shoes | 11/12/09 | $361.90 |
| D | Heat-molded shoe inserts | 11/12/09 | $239.70 |
| D | Ankle gauntlet | 11/12/09 | $189.95 |

39. Beneficiary E reported that she never received the heat-molded diabetic shoe inserts or ankle braces that Jayson Drugs claimed to have provided to her.

| Beneficiary | DME Item | Date of Claim | Amount Billed |
|---|---|---|---|
| E | heat-molded diabetic shoe inserts | 2/13/09 | $239.70 |
| E | Ankle Brace | 2/13/2009 | $189.95 |

40. Claims for these Yonkers beneficiaries were false and fraudulent because the items were either not medically necessary or were never provided to the beneficiaries. The defendants, together with others, caused the submission of these false and fraudulent claims because they engaged in a scheme to refer these beneficiaries to Jayson Drugs to bill Medicare and Medicaid for medically unnecessary DME.

41. Between December 2007 and March 2010, the defendants caused Jayson Drugs to bill Medicare $3,073,858.64 and Medicaid $533,068.85 for false and fraudulent claims.

42.  Law enforcement agents also obtained evidence
regarding other beneficiary recruiters involved in the scheme.
On or about June 23, 2010, CHRISTINA MARJI contacted an
individual familiar with the defendants ("CI") with an offer to
engage in a DME referral arrangement. Law enforcement agents were
familiar with CHRISTINA MARJI based a 2009 investigation
conducted by Health Plus, a company that offers Medicaid-managed
care services.  That investigation revealed questionable claims
related to Jayson Drugs.  Certain claims involved a referring
physician who is located in Brooklyn, New York (Physician A).
The questionable claims included claims for beneficiaries F and
G.

43.  Physician A stated that she never requested the
DME items billed for Beneficiary F.  The name written on the fax
copy of the prescription was "Christina."  The physician later
identified "Christina" as someone who comes to her office to
recruit beneficiaries to receive DME.  She provided the telephone
number of CHRISTINA MARJI.  She reported that CHRISTINA MARJI did
not work for her, but worked with Jayson Pharmacy.  She further
reported that she had received complaints from her patients about
receiving DME that was not medically necessary.

44.  During a consensual telephone conversation with CI
recorded on July 1, 2010, CHRISTINA MARJI reported that she had
worked with RAID RABADI and received payments from him for

referring beneficiaries to receive DME. RAID RABADI would pay her $30 to $40 for each nebulizer order, $120 for oxygen equipment, $120 for hospital beds and varying prices for diabetic shoes. She complained that RAID RABADI had failed to provide her with the full payment for orders for Beneficiary G, one of the beneficiaries involved in the Health Plus scheme.

45. During a second consensual telephone call with CI on July 6, 2010, CHRISTINA MARJI acknowledged that she had worked out of Physician A's office. She said she was able to refer about 30 beneficiaries to RAID RABADI in the her two weeks of working out of that office. She would obtain the beneficiaries' information and provide it to RAID RABADI. RAID RABADI paid her in cash. She knew that RAID RABADI would order additional DME for the patients that she referred to him. She complained that he did not pay her for the additional DME that he ordered. She would "take care of the doctors" by providing gifts to them. For example, she provided gifts to Physician A and her staff.

WHEREFORE, your deponent respectfully requests that the defendants MARCELLA ERAIFEJ, CHRISTINA MARJI and RAID RABADI be

22

dealt with according to law, and also, due to the nature of this application, that this affidavit and warrant be filed under seal until 8:00am on Friday, July 16, 2010.

CANDICE STEPHENSON
Special Agent
Department of Health and Human
Services

Sworn to before me this
13th day of July 2010

_____ JUDGE
EASTERN DISTRICT OF NEW YORK